**In re MARCHFIRST, INC., et al, Debtors.**

**Andrew J. Maxwell, Trustee, Plaintiff**

**v.**

**Progressive Technologies, Inc., Defendant.**

**Bankruptcy No. 01 B 24742. Adversary No. 03 A 01101.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

June 5, 2008.

Vikram R. Barad, Maxwell & Potts, LLC, Zane L. Zielinski, Law Offices of Andrew J. Maxwell, Chicago, IL, for Plaintiff.

James P. Wognum, Law Office of James P. Wognum, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

JOHN D. SCHWARTZ, Bankruptcy Judge.

This matter comes before the court on the motion filed by Andrew J. Maxwell, as Trustee of the estates of marchFirst, et, al, ("Trustee") for summary judgment on his complaint against defendant, Progressive Technologies, Inc. ("PTI"). The complaint alleges that marchFirst, Inc. and its subsidiaries and affiliates (collectively, "Debtor") made a preferential transfer to PTI as such transfer is defined under § 547(b) of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* For the reasons that follow, the motion is granted.

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and Fed.R.Bank.P. 7001 *et seq.* This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F) and (O) in which this court is empowered to enter final judgment. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

### Facts

The following facts are undisputed. On April 12, 2001 ("Petition Date"), the Debtor commenced its bankruptcy cases in the United States Bankruptcy Court for the District of Delaware ("Delaware Court") by voluntarily filing petitions for relief under Chapter 11 of the Bankruptcy Code.

The Debtor moved to convert its cases to cases under Chapter 7 of the Bankruptcy Code and on April 26, 2001, the cases were converted. By order dated July 10, 2001, the Delaware Court transferred the cases to the United States Bankruptcy Court for the Northern District of Illinois. On July 16, 2001, the Trustee was appointed to serve as successor Chapter 7 trustee,

The Trustee alleges that PTI is a Minnesota corporation with its principal location at 10525 Hampshire Avenue # 600, Bloomington, MN 55438. The evidence submitted on this issue is a document from the Minnesota Secretary of State's website, indicating that Progressive Technologies is an active entity operating as an "Assumed Name" as of July 25, 2003 at the address 10525 Hampshire Avenue # 600, Bloomington, MN 55438. The entity that invoiced the Debtor in late 2000 and was paid by the Debtor in early 2001 has the same name and address as the entity profiled by the Minnesota Secretary of State, PTI asserts that the entity identified in the Minnesota Secretary of State's website is not a corporation but rather the assumed name of a different corporation which is not the corporation that received the transfer described by the Trustee in his complaint.

During the 90 days preceding the Petition Date the Debtor made one transfer to PTI in the amount of $152,747.42 by Debtor's check no. 2020976 dated January 16, 2001 ("Transfer"). The Transfer was made to or for the benefit of PTI. The Transfer was made on account of an antecedent debt, to pay invoice no. S127832-000 dated September 7, 2000 issued by PTI to the Debtor. By operation of § 547(f) of the Bankruptcy Code, the Debtor is presumed to have been insolvent during the 90 days preceding the Petition Date. PTI attempts to rebut the presumption of insolvency, but has failed to do so, as will be discussed below.

Under the payment terms set forth in the invoice, Debtor's payment was due within 30 days of the date of the invoice. The Transfer was made not less than 137 days after the date of PTI's invoice. Because the Debtor is presumed to have been insolvent at the time of the Transfer, by definition holders of non-priority general unsecured claims against the Debtor at the time of the Transfer would not have received full payment on account of their claims had the Debtor been a debtor in a Chapter 7 at that time.

### Discussion

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c), applicable to adversary proceedings by Fed.R.Bankr.P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 321 (7th Cir.2001). A court must view the record in the light most favorable to non-movant, drawing all reasonable inferences in its favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Wade v. Lerner New York, Inc.*, 243 F.3d at 321,

Fed.R.Civ.P. 56(e)[1], also provides that "[w]hen a motion for summary judgment is made and supported as provided in tills rule, an adverse party may not rest upon the mere ... denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial If the

1. This rule was amended after the filing of this adversary proceeding.

adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse parly."

### Trustee's Cause of Action

■ Section 547(b) of the Bankruptcy Code, which governs avoidable preferential transfers, requires that the Trustee demonstrate five elements to avoid a transfer: (1) the transfer was to a creditor; (2) for or on account of an antecedent debt owed by the debtor prior to the transfer; (3) made while the debtor was insolvent; (4) on or within 90 days before the Petition Date, and (5) that enables the creditor to receive more than it would receive if the case had already been a case under Chapter 7, the transfer had not been made and the creditor received what it would have received under the Bankruptcy Code, Pursuant to § 547(g) of the Bankruptcy Code, the Trustee has the burden of proving the avoidability of a transfer by a preponderance of the evidence. *See Field v. Lebanon Citizens National Bank (In re Knee)*, 254 B.R. 710, 712 (Bankr.S.D.Ohio 2000).

The Trustee has demonstrated each element of this cause of action. PTI argues that it can rebut the presumption of insolvency.

### Presumption of Insolvency

■ Section 547(f) provides that "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." The presumption of insolvency "is a rebuttable one. A creditor may rebut the presumption by introducing some evidence that the debtor was not in fact insolvent at the time of the transfer. If the creditor introduces such evidence, then the trustee must satisfy its burden of proof of insolvency by a preponderance of the evidence." *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.)*, 78 F.3d 30, 34 (2d Cir.1996); *Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.)*,

192 B.R. 477, 485–86 (Bankr.N.D.Ill.1996). PTI would like the court to consider news articles from January and April 2001 and the Debtor's own schedules as evidence that the Debtor was solvent prior to and at the time of its bankruptcy filing.

The news articles are inadmissible as hearsay. *See Boim v. Holy Land Foundation for Relief and Development*, 511 F.3d 707, 752 (7th Cir.2007); *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir.2005); *Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir.2001).

With respect to the Debtor's Schedules, the court refers to *Maxwell v. Fleet Capital Leasing (In re marchFirst)*, Adversary Proceeding 03A01352 (2005) in which this court analyzed the issue of using this Debtor's Schedules to rebut the presumption of insolvency in this case. In *Fleet Leasing*, this court found the following facts about this bankruptcy case.

In the early months of this case, the Trustee explained in court the utter chaos of the Debtor's books and records. Even with the assistance of qualified professionals such as PriceWaterhouseCoopers, the Schedules could not be filed until November 7, 2001, seven months after the case was filed. The Schedules were prepared after discussion with "marchFirsts general counsel, controller, assistant treasurer, and various human resources personnel." Notably absent from this list were the Chief Executive Officer, Chief Operating Officer and Chief Financial Officer, all of whom, upon information and belief, had abandoned the Debtor altogether.

Also very important to the resolution of the issues presented in this motion is a comparison between the liabilities scheduled in this case and the actual claims filed. The Trustee listed $53,141,957 in secured claims,

$15,045,981 in unsecured priority claims and $94,287,178 in unsecured nonpriority claims for a total of $162,475,116 in liabilities. As of December 13, 2004, the actual claims filed according to the court's Claims Register were $141,959,568 in secured claims, $135,591,433 in priority claims, $708,536,194 in unsecured claims, $4,986,076 in multiple class-single claims and $8,895,746 in administrative claims for total liabilities of $999,969,019. The Schedules underestimated the Debtor's possible liabilities in the amount of $837,493,903. Even subtracting the administrative claims, which accrue during the case and have no bearing on the figures as of the Petition Dale, the total claims are $991,073,273, which is $828,598,157 over the scheduled liabilities.

\*    \*    \*    \*    \*    \*

The Schedules state that, as of the Petition Date, the assets of the Debtor were valued at $325,506,175 and the liabilities totaled $162,475,116.

In *Fleet Leasing,* this court analyzed the case law discussing the use of Schedules in determining solvency. In *Schwinn,* Judge Schmetterer expressed strong reservations about the accuracy of Schedules.

"The Schedules of Assets and Liabilities filed by Schwinn Bicycle Company, the parent corporation of the other Debtors, showed an excess of assets over liabilities. However, Debtor's schedules arc not persuasive, let alone dispositive or controlling. For analysis of possible insolvency, reliance should be on more accurate evidence, such as current appraisals, opinion valuation testimony, or actual sales of the assets, [Citations omitted]. The Seventh Circuit in *Taxman* has noted the great potential for inaccuracy in relying solely on a schedule of assets and liabilities in assessing insolvency. [Citation omitted]." *Schwinn* at 487.

Furthermore, this court found the opinion in *W.L. Mead, Inc. v. Central States Pension Fund (In re W.L. Mead, Inc.),* 70 B.R. 651 (Bankr.N.D.Ohio 1986) to be particularly helpful in this case, where there is an enormous discrepancy between the scheduled liabilities and the actual claims filed against the estate. In *Mead,*

the Defendant appears to contest that presumption [of insolvency] based upon the figures found in the Debtor's schedules. While it is recognized that the statements made in a Debtor's schedules can constitute evidence which may be used in subsequent proceedings, *the magnitude of the discrepancy between the scheduled values and the actual sale prices strongly suggests that any inference which could be drawn from the schedules is not worthy of serious consideration.* If the remaining properties are sold at a price which is similar in difference to the values listed on the schedule, then it appears that the Debtor will, in fact, have been insolvent at the time the judgment was filed. In light of all the facts in this case, it cannot be said that the evidence as to solvency found in the Debtor's schedules overcomes the presumption found in 11 U.S.C. § 547(f).

Accordingly, it must be concluded that the presumption of insolvency remains intact, *Id.* at 655. (Emphasis supplied).

In *Fleet Leasing,* the parties disagreed over the value of the assets. The Trustee pointed to several examples where the estate had received a fraction of the scheduled value of an asset or class of assets. Fleet responded by pointing out that the four fully administered assets brought in more for the estate than scheduled. Both parties in that case neglected to look at the other side of the balance sheet.

After examining the record in this bankruptcy case in 2005, the court came upon the almost one billion dollars in claims that the Trustee and his professionals did not anticipate. The "magnitude of the discrepancy" between the scheduled liabilities and the actual claims "strongly suggests that any inference which could be drawn from the schedules is not worthy of serious consideration." Even though not every claim has since withstood scrutiny, balancing almost $1 billion in claims against the scheduled liabilities of $162,475,116 led this court to rule in *Fleet Leasing* that the Schedules in this bankruptcy case are not a reliable picture of the Debtor's financial health as of the Petition Dale and are not sufficient to rebut the presumption of insolvency. Without any additional proof, that ruling stands as the law of this case and *res judicata* on this issue. The presumption of insolvency remains unrebutted.

**Defendant as the Proper Party**

██  For the very first time in this case in its response to the Trustee's motion, PTI asserts that it is not the proper party defendant in this proceeding. It did not raise the issue in its answer. It does not address the issue in its memorandum of law. There is only a short statement in its Local Rule 7056 Response to the Trustee's Statement of Facts and in the affidavit of Joseph Morton, a principal of PTI. Mr. Morton avers that PT1 sold its assets and its name "in 2003". and that the corporation is no longer in business. He further avers that the registration of the "assumed name 'Progressive Technologies'" was tiled by the purchaser of the assets and name. No other facts or law is provided to the court other than the document from the Minnesota Secretary of State.

██  "Minnesota follows the traditional approach to corporate successor liability. In *J.F. Anderson Lumber Co. v. Myers,*

296 Minn. 33, 206 N.W.2d 365 (1973), we set forth four circumstances under which successor corporations may be held liable for actions of a transferor corporation: [W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts." *Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96, 98 (Minn.1989).

Given the slim record on this issue, the court can only conclude that the transaction fell within the exception that the purchasing corporation is merely a continuation of the selling corporation and that the purchasing corporation is liable for the debts of PTI. The new corporation has the same name, same assets and same address as the prior corporation. The court also finds significant that the tiling with the Minnesota Secretary of State of the "successor corporation" took place on July 25, 2003, less than four months after this proceeding was filed on March 30, 2003. The timing suggests an effort by the principals of PTI to escape liability for this debt, another instance under Minnesota law when a successor corporation remains liable for the debts of the transferor. Mr. Morton only states that the transfer of assets took place "in 2003." Also curious is that the answer, filed on June 12, 2003, did not reflect nor was ever amended to reflect the now alleged sale of the business. Without more, the court cannot absolve PTI of liability.

**Ordinary Course of Business**

██  PTI also seeks to defend itself by asserting the ordinary course of business

defense. II U.S.C. § 547(c). The defendant bears the burden of proving an ordinary course of business defense by a preponderance of the evidence. *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337 (S.D.N.Y.1999). "In order for a creditor to prevail using the ordinary course of business exception to 547(b), the creditor must show that the debt had been incurred in the ordinary course of business of both the debtor and the creditor; that the payment too, had been made and received in the ordinary course of their businesses; that the payment was made according to ordinary business terms." *Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029, 1031 (7th Cir.1993).

PTI issued an invoice, the face of which clearly indicated that the terms of payment were "Net 30." In addition, PTI stamped the invoice as "Past Due." It is uncontested that the Transfer occurred 137 days after the date of the invoice and therefore outside of PTI's stated payment terms. In its response to the Trustee's motion, PTI makes a myriad of assertions about alleged negotiations that were taking place between the parties about whether the telephone equipment would be leased or purchased outright. PTI's argument is that these negotiations delayed the payment and kept it within the parameters of the ordinary course of business between these parties. However, PTI did not provide any documentary evidence of the negotiations such as contracts or written communications. Significantly, the alleged negotiations are not referenced in either PTI's answer or its discovery responses. It also seems curious that the invoice was stamped "Past Due" if the parties were engaged in negotiations over the nature of the transaction. All of this casts doubt on the credibility of Mr. Morton's affidavit, which is the only evidence that such negotiations took place. The affidavit, by itself, and under these circumstances, is insufficient to meet PTI's burden of proof.

With respect to the next element of this defense, "ordinary business terms" refers to a range of payment terms encompassing the practices of firms similar to that creditor, *Tolona Pizza*, 3 F.3d at 1033. It is therefore necessary for a creditor to present some evidence establishing the range of acceptable practices within the industry. *In re Midway Airlines*, 1995 WL 331053 (N.D.Ill.1995) (unpublished opinion). *Superior Toy & Mfg. Co., Inc.*, 183 B.R. 826, 836 (Bankr.N.D.Ill.1995). In *In re Apex Automotive Warehouse*, 245 B.R. 543 (Bankr.N.D.Ill.2000), the court opined that a creditor "must present evidence of the actual practices of its competitors." *Id.* at 550. The creditor against whom recovery is sought has the burden of proving the nonavoidability of a transfer under § 547(c). 11 U.S.C. § 547(g).

Simply put, PTI supplied no evidence of the range of acceptable practices in its industry at all and failed to sustain its burden of proof.

### Conclusion

For the foregoing reasons, the Trustee's motion will be granted by separate order.